IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL JOHN HUGGINS,

               Petitioner,

vs.

R. LOPEZ,

               Respondent.

_____/

No. CIV S-10-CV-1742 KJM CHS

FINDINGS AND RECOMMENDATIONS

## 1. INTRODUCTION

Petitioner, Michael John Huggins, is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is currently serving a determinate sentence of seventeen years and four months following his 2007 convictions in the Yuba County Superior Court for two counts of voluntary manslaughter with penalty enhancements as to each count for use of a firearm. Here, Petitioner challenges the constitutionality of his convictions.

## II. CLAIMS

Petitioner presents several grounds for relief. Specifically, the claims are as follow:

(1)    The trial court erred by failing to instruct on involuntary manslaughter as a lesser included offense.

-1-

(2)    The trial court erred by refusing a pinpoint instruction on self-defense.

(3)    The trial court erred by excluding photographic evidence of weapons found at the crime scene.

Petitioner's first and second grounds for relief both present challenges to the jury instructions, and thus will be addressed together in section (V)(A), below. Petitioner's remaining third ground for relief will be addressed individually in section (V)(B). Based on a thorough review of the record and applicable law, it is recommended that each of Petitioner's claims be denied.

## III. BACKGROUND

The basic facts of Petitioner's crime were summarized in the unpublished opinion of the California Court of Appeal, Third Appellate District, as follow:

> In September 2005, defendant lived at 3112 Black Eagle Drive in Antelope with his girlfriend, Angelic Rampone, Matt Griffin, Griffin's girlfriend, Amy Butler, and two others not implicated in this matter. Other acquaintances who frequented the house included defendant's cousin, Dustin Sparks, and Levill Hill.
>
> Approximately one to two weeks before September 26, 2005, Hill, Griffin, Butler, Rampone, and defendant discussed stealing marijuana. Butler mentioned there were two people she knew from high school, Chris Hance and Scott Davis, who lived in Olivehurst and grew marijuana. Butler said the men guarded the marijuana plants, were good fighters and had guns. The five hatched a plan whereby Butler would lure Hance and Davis away from the property and the others would sneak onto the property and steal the plants.
>
> The property mentioned by Butler was located at 5108 Chestnut in Olivehurst. It contained a house and a trailer at the end of a driveway behind the house. Twelve feet from the trailer door were nine marijuana plants surrounded by tobacco plants. Chris Hance and Scott Davis resided in the trailer. Chris's father, Michael Hance, lived in the house with Chris's mother and sister. Michael Hance had a medical marijuana recommendation.
>
> At or shortly after 9:00 p.m. on the day they hatched their plan, defendant and the others drove to Olivehurst in two cars. Butler proceeded to the property alone but was able to lure only Davis from the property. Meanwhile, Hill, Griffin and defendant walked past the front of the property and on to a store down the street, while Rampone waited in the car for a message from Butler. When the

three men learned Butler had not been able to lure both guards away, they decided to abandon their plan and return to the car. As they walked past the property, they saw a man standing by a gate with a dog. They asked him where they might buy some "hard alcohol" and then returned to the car. They drove back to Antelope where they met up with Butler.

In the early morning hours of September 27, 2005, Hill, Griffin, Rampone and defendant decided to return to the Olivehurst property and try again to steal the marijuana. On this occasion, the plan was to enter the property over a fence in the rear and steal the plants without the guards' knowledge. However, they also brought rope and duct tape to tie up the guards if necessary. On the way to the property, they picked up Dustin Sparks.

As before, Rampone waited in the car while the others walked by the property. Defendant carried a handgun in his waistband and a "[c]op flashlight." Defendant told Hill he had the flashlight in order to pretend he was a police officer. When the four reached the property, they observed it was "lit up like a Christmas tree." Stopping at a nearby apartment complex, they again agreed to abandon their plan.

What happened thereafter is subject to conflicting testimony. Levill Hill testified for the prosecution that defendant and Sparks started back toward the car, followed by Griffin and Hill. However, when the latter two reached the property, they saw defendant kneeling by a car with Sparks standing nearby. Hill asked defendant what he was doing and defendant said, "We're going to do it." Hill said, "No, you're not" and began walking away.

As Hill looked back towards the property, he saw defendant walk through a gate onto the property while Sparks remained at the gate. Defendant went around the north side of the home and out of sight. Hill heard defendant say "Marysville Police or Yuba Police" and that he was looking for Scott or Davis. Someone came out of the house and hit Sparks. Hill heard a gunshot, and he and Griffin ran to the car. While they were running away, Hill heard someone scream.

Michael Hance testified that, at approximately 3:00 a.m. on September 27, he was lying on a couch in the house talking with his son when they heard a gate open. Chris Hance got up and went out the front door toward the gate to investigate. Michael heard someone say, "Yuba County Sheriff's. Get on the ground" and then heard scuffling. He heard a shot and a little later heard someone say, "I'm here for Scott Davis. I want Scott Davis."

Thinking the police had arrived, Michael got up, grabbed his medical marijuana paperwork, and walked to the back door. There he heard yelling and saw the defendant walk into the trailer with his right hand

-3-

up and something in his hand.  Michael heard some more yelling and then one or two shots.  He started walking toward the trailer to see what was happening.  Just then, Chris Hance ran by and said, "They're not the police, Dad.  They're not."  Chris ran on to the trailer and Michael followed.

Michael then saw his son, Davis and defendant come out of the trailer.  Davis was holding his neck, moved off to the right, and fell to the ground.  Chris Hance and defendant were fighting on the ground when Michael saw a flash and heard a bang.  At that point, Michael went inside the trailer and grabbed a shotgun.  When he came back outside, Michael saw defendant get up from the ground and say to Chris, "Stay on the ground.  Sheriff's Department.  Stay on the ground."  Chris Hance again told his father defendant was not a police officer.  Michael pointed the shotgun at defendant and asked for identification.  Defendant fled.

Michael Hance called 911 at 3:02:48 a.m.  When the police arrived on the scene, they found a dog lying on the driveway that had been shot and Davis lying face down near the trailer.  Davis too had been shot and was dead.  The officers found Chris Hance lying nearby face up.  He had been shot and was "bleeding profusely," but was still alive.  Hance later died of his wounds.

When defendant and the others returned home, defendant looked scared, agitated and irritable and immediately locked the doors and windows.  Because defendant had left the flashlight at the scene, he asked Butler to make up a story for the authorities that, when Butler went to the property the first time, she left the flashlight behind.  Butler also concocted a story with Griffin that defendant had gone to the property with her the first time and they met with the victims, smoked marijuana, and discussed defendant and Butler buying marijuana.

The authorities found the flashlight at the scene.  Fingerprints taken from it matched defendant.  They also found a piece of a shirt clutched in Davis's hand.  The remainder of the shirt was found at defendant's residence several days later.  The authorities found one shell casing just inside a closet door in the trailer and three other casings outside.  They recovered three bullets, one each from the dog, Hance, and Davis.  All three had been shot from the same gun.  The fourth bullet was never found.  They found no signs of a struggle inside the trailer.

Defendant testified on his own behalf and provided a much different description of the events after he entered the property.  Defendant said that when the four of them decided not to go through with the theft because the place was too lit up, he told them he was going to try to buy some marijuana.  Therefore, when he entered the property,

-4-

that was his intent.  Defendant testified that he told Sparks to wait at the gate, walked to the front door of the house, and knocked.  Receiving no response, defendant walked back to the gate and told Sparks to remain there while he checked to see if anyone was in the trailer.

Defendant walked down the driveway toward the trailer.  According to defendant, the trailer door was open and there was light coming from inside.  When defendant got about half way to the trailer, he heard someone yell, "[g]o get him."  Defendant yelled that he was there to talk to Scott Davis.  Defendant saw a big dog emerge from the trailer door and come toward him, growling and bearing [sic] its teeth.  Defendant began backing away.  The dog jumped at him, and defendant stumbled backward, pulled the gun out and shot the dog.  The dog yelped and ran away.

At that point, defendant tried to retreat from the property.  However, as he reached the corner of the house, he encountered a man holding a gun.  The man grabbed defendant's shoulder and pushed the gun into his face.  Defendant put his hands into the air, holding his own gun in one hand and the flashlight in the other.  The man spun defendant around and put his gun to the back of defendant's ear.  The man said, "You shot my fucking dog" and "You're going to fucking die."  He began moving defendant toward the trailer.

When they reached the trailer, the man said to defendant, "Get your ass in the fucking trailer."  Defendant saw another man standing in the trailer.  Defendant refused to go inside.  He dropped the flashlight, spun around, and knocked the man's gun away from his face.  They struggled for control of the gun.  As they moved away from the trailer entrance and the man got the gun back in defendant's face, defendant fired his own gun to try to distract the man.  Defendant tried to fire again but his gun jammed.  They fell to the ground, where defendant worked to "clear" his gun.  By the time defendant succeeded in doing so, the man was on top and behind defendant pushing him to the ground.  Defendant reached around behind him, pushed the gun into the man and fired.

The man fell off defendant.  Defendant got up and started running away.  However, the other man jumped on defendant and knocked him to the ground, causing defendant to drop his weapon.  Defendant eventually succeeded in retrieving his weapon, rolled over and shot the man.  Defendant pulled himself free.  However, because the man still had hold of defendant's shirt, a portion of it tore away.

As defendant began to depart, he encountered Michael Hance pointing a shotgun at him.  Defendant pulled his gun up and said, "Yuba County Sheriff.  Get down."  When Michael lowered his gun, defendant turned and ran.  Defendant eventually caught up with the

-5-

others in the car and returned to the Antelope property.

Defendant testified that his original idea was to buy marijuana and resell it. According to defendant, it was Hill who suggested stealing the marijuana instead. Defendant had money to buy the marijuana, but the others did not. Defendant testified that, on the first occasion, when they encountered the man at the gate of the property, they had asked about buying some marijuana. According to defendant, the man said he knew where they could get some but his "home boy" was not around so they would have to come back later.

Defendant further testified that, on the second occasion, he asked again about buying the marijuana but Butler insisted on stealing it. Nevertheless, defendant brought money along with him. Defendant said that, when they arrived in Olivehurst, he opened the glove box of the car and discovered the handgun. According to defendant, Hill said he had put the gun there. When the defendant went to put it back, Rampone said she did not want the gun with her, so defendant put it in his waistband.

As indicated above, defendant was charged with two counts of felony murder during the commission of either robbery or burglary. The jury found defendant not guilty of murder but convicted him on both counts of the lesser included offense of voluntary manslaughter. The jury also found defendant personally used a firearm in connection with each offense (§ 12022.5). He was sentenced on count one to the middle term of six years plus an enhancement of 4 years for the weapon use. He was sentenced on count two to a fully consecutive term of six years plus a one-third enhancement of one year, four months, for a total of 17 years, four months.

*People v. Huggins*, 2009 WL 774512, *1-*4.

Petitioner timely appealed his convictions to the California Court of Appeal, Third Appellate District. The court affirmed his convictions with a reasoned opinion on March 25, 2009. He then filed a petition for review of the appellate court's decision in the California Supreme Court. The court denied the petition without comment on July 8, 2009. Petitioner did not seek habeas corpus relief at the state level. Petitioner filed his federal petition for writ of habeas corpus on July 1, 2010. Respondent filed its answer on September 24, 2009, and Petitioner filed his traverse on November 11, 2010.

/////

## IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of *habeas corpus* filed after its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000).  Federal *habeas corpus* relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  *See also Penry v. Johnson*, 531 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).  This court looks to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).

## V.  DISCUSSION

**A.  JURY INSTRUCTIONS**

Petitioner alleges two grounds for relief based on instructional error.  He first contends that the trial court erred when it failed to instruct the jury on involuntary manslaughter as a lesser included offense of the crime of murder.  Secondly, he claims that the trial court erred by refusing to give pinpoint instructions about his rights to self-defense under the facts in his case,

-7-

1  which raised a reasonable doubt as to his guilt.

2          "Normally jury instructions in State trials are matters of State law." *Hallowell v.*

3  *Keve*, 555 F.2d 103, 106 (3rd Cir. 1977) (citation omitted). *See also Williams v. Calderon*, 52 F.3d

4  1465, 1480-81 (9th Cir. 1995). Federal courts are bound by a state appellate court's determination

5  that a jury instruction was not warranted under state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76

6  (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state

7  law, including one announced on direct appeal of the challenged conviction, binds a federal court

8  sitting in habeas corpus." An instructional error, therefore, "does not alone raise a ground

9  cognizable in a federal habeas [corpus] proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th

10 Cir. 1986) (citation omitted). *See also Van Pilon v. Reed*, 799 F.2d 1332, 1342 (9th Cir. 1986)

11 (claims that merely challenge correctness of jury instructions under state law cannot reasonably be

12 construed to allege a deprivation of federal rights) (citations omitted).

13         Petitioner could still be entitled to habeas corpus relief if he could establish that the

14 state court violated his due process rights by omitting a jury instruction if the alleged error so

15 infected the entire trial that the resulting conviction violated due process. *Henderson v. Kibbe*, 431

16 U.S. 145, 155 (1977); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005). Federal habeas

17 corpus relief is not warranted, however, unless he demonstrates that the alleged error had a

18 "substantial and injurious effect in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S.

19 619, 623 (1993). In other words, Petitioner must prove that, had the requested instruction been

20 given, there is a "reasonable probability" that the jury would have reached a different verdict. *Clark*

21 *v. Brown*, 450 F.3d 898, 916 (9th Cir. 2006). In the context of an allegation that a trial court failed

22 to give a jury instruction, a petitioner's burden is "especially heavy," because "[a]n omission, or an

23 incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*,

24 431 U.S. at 155.

25 /////

26                                           -8-

## 1.  INVOLUNTARY MANSLAUGHTER INSTRUCTION

Petitioner claims that the trial court failed to instruct the jury on involuntary manslaughter as a lesser included offense of first degree felony murder, in violation of his federal constitutional right to present a defense and to have the jury determine every material issue presented by the evidence.  Petitioner argues that he was entitled to such an instruction based upon three separate theories.  First, he  argues that the homicides occurred while he was engaged in the criminally negligent and intentional commission of a misdemeanor under dangerous circumstances.  Petitioner's second theory of involuntary manslaughter is that the homicides occurred while he was engaged in the commission of a lawful act which might produce death, in an unlawful manner or with criminal negligence.   Third, Petitioner contends that the homicides occurred during the criminally negligent commission of a non-inherently dangerous felony.  According to Petitioner, all three theories entitled him to an instruction defining involuntary manslaughter as a lesser included offense.

The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on direct appeal, explaining as follows:

> Defendant contends the trial court was required to instruct on involuntary manslaughter as a lesser included offense of murder.  He argues there were many theories and scenarios under which the jury could have found he committed involuntary manslaughter rather than murder or voluntary manslaughter.   We conclude the evidence presented at trial left no room for an involuntary manslaughter verdict and, therefore, instructions on that offense were properly refused.
>
> In any criminal matter, the jury must be instructed on all crimes necessarily included within the offense charged if there is substantial evidence from which a reasonable jury could conclude the defendant is guilty only of the lesser offense.  (*People v. Birks* (1998) 19 Cal.4th 108, 118.)  This obligation exists even absent a request and even over the parties' objections.  (*Ibid.*)  "Where the evidence warrants, the rule ensures that the jury will be exposed to the full range of verdict options which, by operation of law and with full notice to both parties, are presented in *the accusatory pleading itself* and are thus closely and openly connected to the case.  In this context, the rule prevents either party, whether by design or

inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other." (*Id*. at p. 119.)

"Manslaughter is 'the unlawful killing of a human being without malice.' (§ 192.) Involuntary manslaughter is a killing committed 'in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).) Generally, involuntary manslaughter is a lesser offense included within the crime of murder. [Citations.]" (*People v. Prettyman* (1996) 14 Cal.4th 248, 274.)

Under the unlawful act prong of involuntary manslaughter, defendant argues the jury could have concluded he was guilty of trespassing, brandishing a firearm, or purchasing marijuana, with the most obvious choice being trespassing. According to defendant, "a reasonable jury could find that the way [defendant] entered the property involved committing the misdemeanor of trespassing." However, assuming this to be true, it alone would not support an involuntary manslaughter verdict. In order for an unlawful act to give rise to involuntary manslaughter, the act must be both unlawful and dangerous to human life or safety. (*People v. Cox* (2000) 23 Cal.4th 665, 675.) Dangerousness is determined under the circumstances of the act's commission, not in the abstract. (*Ibid*.)

Defendant makes no attempt to explain how the manner in which he committed trespass was dangerous to human life or safety. According to defendant's account of the incident, he entered the property through a gate, walked up to the front door and knocked. After receiving no response, defendant proceeded toward the trailer and yelled that he was there to talk to Scott Davis. Although it was late at night, the area was well lit. Violence erupted only after defendant was attacked by the dog and shot it. There is nothing in the foregoing to suggest the way in which defendant committed the trespass, if indeed there was a trespass, was dangerous to human life.

Under the lawful act done without due caution and circumspection prong of involuntary manslaughter, defendant argues his entry onto the victim's property was lawful by virtue of an implied invitation, inasmuch as the victims were known marijuana dealers and the property was well lit even at 3:00 a.m. Defendant further argues the jury could have concluded the entry was done without due caution and circumspection in light of defendant's knowledge that the victim's [sic] were armed.

If defendant entered the property with the intent to purchase marijuana, as he testified, this would not be a "lawful act" within the meaning of the involuntary manslaughter statute. Furthermore, if the

-10-

circumstances were as defendant suggests, this would support a charge of implied malice murder rather than involuntary manslaughter. "The words 'without due caution and circumspection' refer to criminal negligence-unintentional conduct which is gross or reckless, amounting to a disregard of human life or an indifference to the consequences. [Citation.] If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice. [Citation.]" (*People v. Evers* (1992) 10 Cal.App.4th 588, 596.) "[T]he essential distinction between second degree murder based on implied malice and involuntary manslaughter is the subjective versus objective criteria to evaluate the defendant's state of mind-i.e., if the defendant commits an act which endangers human life without realizing the risk involved, he is guilty of manslaughter, whereas if he realized the risk and acted in total disregard of the danger, he is guilty of murder based on implied malice." (*People v. Cleaves* (1991) 229 Cal.App.3d 367, 378.)

Defendant suggests his entry onto the victim's property was without due caution and circumspection because he was aware the victims were armed. Although the fact that the victims were armed would not appear to create a danger to anyone other than defendant himself, and it is unlikely the drafters of the manslaughter statute were concerned with acts that endanger the life of the actor alone, here defendant was also aware marijuana was being grown on the property, he was entering the property at 3:00 a.m., and he was himself armed, all factors that would create a risk to everyone involved. However, there is nothing in the evidence to suggest defendant was not fully aware of the dangers posed by his entry onto the property under these circumstances. Because defendant was aware of the danger but proceeded onto the property anyway, this would subject him to a charge of implied malice murder, not involuntary manslaughter.

Defendant contends he was nevertheless entitled to an involuntary manslaughter instruction under a third theory. Defendant was charged with first degree felony murder, which is murder committed in the course of certain designated crimes, including robbery and burglary. (§ 189.) Second degree felony murder occurs where the murder takes place during the commission of any other felony that is inherently dangerous to human life. (*People v. Robertson* (2004) 34 Cal.4th 156, 166.) As explained above, involuntary manslaughter includes an unintentional killing during the commission of "a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) In *People v. Burroughs* (1984) 35 Cal.3d 824, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89, the California Supreme

Court construed "lawful act" within the meaning of the foregoing to include felonies that are not inherently dangerous.  Hence, involuntary manslaughter includes "an unintentional homicide committed in the course of a noninherently dangerous felony (which might, nevertheless, produce death if committed without due caution and circumspection)." (*Id*. at p. 836.)

In *People v. Morales* (1975) 49 Cal.App.3d 134, 143, the Court of Appeal concluded grand theft is a felony that is not inherently dangerous to human life.  The court further concluded a homicide committed during a grand theft could give rise to a conviction for involuntary manslaughter.  (*Id*. at p. 144.)

Defendant contends a reasonable jury could have concluded the killing of Christopher Hance and Scott Davis occurred during the attempted commission of grand theft rather than robbery or burglary.  Defendant points to the fact the original plan was to steal marijuana either by luring the victims away or by sneaking onto the property from the rear.  Their intent was to avoid a confrontation with the victims and hence to avoid the need to use force.  According to defendant, when the others backed out of the plan on the second attempt, he "originally entered with the intent either to steal the marijuana or buy the marijuana, whichever was possible under the circumstances."

Although defendant raised this argument below in support of his request for an involuntary manslaughter instruction, the record does not reveal why the trial court refused to give the instruction.  Nevertheless, we conclude the evidence presented at trial did not support a theory that the homicides occurred during an attempted theft.  Rather than enter the premises after the victims were lured away or from the rear, as originally planned, defendant walked through the front gate.  According to defendant, the front of the home was "lit up like a Christmas tree."  Defendant was armed with a handgun and a "[c]op flashlight."

Levill Hill testified that, after they decided not to go through with the theft the second time, they walked back by the front of the premises.  Hill heard defendant say "[t]hat he was going to do it."  He also heard defendant yell, after entering the property, "Marysville Police or Yuba Police," saw someone hit Dustin Sparks, and then heard a gunshot.  Hill heard defendant say he was looking for Scott Davis.

Michael Hance testified that after he and Christopher Hance heard the gate open, Christopher went out to investigate.  Michael Hance then heard someone say, "Yuba County Sheriff's.  Get on the ground."  He heard scuffling and then someone say, "I'm here for Scott Davis.  I want Scott Davis."  Michael Hance walked outside and saw defendant go into the trailer with his right hand up, heard some

-12-

yelling, and then heard one or two shots. He then saw Christopher Hance run to the trailer and saw defendant and both victims come out of the trailer. Scott Davis fell to the ground and defendant and Christopher Hance fought on the ground until there was a flash and a gunshot.

Defendant testified that, after they decided not to steal the marijuana on the second occasion, he told the others that if there was anyone outside, he was going to talk to them about buying marijuana. Defendant further testified he approached the residence for this purpose. Defendant indicated that, after he received no response at the front door, he approached the trailer and heard someone yelling, "Go get him." Defendant yelled that he was there to talk to Scott Davis, but the dog came at him. According to defendant, after shooting the dog, he was attacked by the victims and shot them in self defense.

The foregoing evidence gave the jury essentially two choices. Either defendant entered the property with the intent to rob, as the prosecution witnesses testified, or he entered the property with the intent to buy, as defendant testified. There was no evidence presented that, at the time defendant entered the property, his intent was to steal the marijuana. If the jury rejected defendant's theory, it cannot reasonably be argued defendant believed he could enter the front gate, announce his presence, walk past the house and trailer, pull up the marijuana plants, and depart with the loot undetected.

Nevertheless, defendant suggests the jury's questions during deliberations show they believed his original intent was in fact to steal the plants. In one question, the jury asked: "If I enter a property intending to steal without entering a building, does it automatically become attempted robbery if I know someone is on the property *and* I encounter that person?" The jury also asked: "If I enter a property intending to steal property, but have it in my head as a contingency that I will use force or fear to get the property if I encounter someone, is that attempted robbery, or does instruction 6.00 on page 18 rule that out because my intent is not specific or unambiguous[?]" Later the jury said it was deadlocked on "whether there is reasonable doubt about: [¶] 1) Whether Michael Huggins intended to / attempted [to] use force or fear and [¶] 2) Whether Michael Huggins intended to take / attempted to take from the owners' presence." Later, the jury asked: "If I intended to steal and during the attempt to steal, circumstances put me in the immediate presence of someone and that person feels fear or force, did I attempt to rob even if I didn't intend to rob and no property was taken[?]" Finally, the jury asked: "Do I have to make a conscious choice to commit robbery to be guilty of attempted robbery[?]"

The foregoing questions suggest at least one of the jurors may have

-13-

concluded, at least initially, that defendant' original intent was to steal the plants and not to rob the victims.  Although the question remained whether an intent to rob arose after defendant was confronted by the victims and had a choice whether to flee or to proceed, the jury necessarily concluded there had been no intent to rob, inasmuch as the jury found defendant not guilty of felony murder.

However, the question presented to the trial court, and to us on appeal, is whether there was sufficient evidence presented at trial to support a theory that defendant's intent was to steal the marijuana without the use of force or fear.  As we have explained, there was not.  The fact the jury may nevertheless have so concluded does not change the situation.  The jury's verdict may suggest nothing more than a compromise or a desire to be merciful.  (See *People v. Amick* (1942) 20 Cal.2d 247, 252; *People v. Federico* (1981) 127 Cal.App.3d 20, 32-33.)

*Huggins*, 2009 WL 774512 at *5-*8.

There is no clearly established federal law that requires a state trial court to give a lesser included offense instruction as would entitle Petitioner to relief.  *See* 28 U.S.C. § 2254(d)(1); *Beck v. Alabama*, 447 U.S. 625, 638 (1980) (holding that failure to instruct on lesser included offense in a capital case is constitutional error if there was evidence to support the instruction but expressly reserving "whether the Due Process Clause would require the giving of such instructions in a non-capital case"); *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (in non-capital case, failure of state court to instruct on lesser included offense does not alone present a federal constitutional question cognizable in a federal habeas corpus proceeding); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) (failure of state trial court to instruct on lesser included offenses in non-capital case does not present federal constitutional question).  Moreover, even if clearly established federal law did require a state trial court to give a lesser included offense instruction, the state appellate court reasonably determined that the evidence presented at trial did not support an involuntary manslaughter verdict under California law  and thus the instruction was properly refused.  Federal courts are "bound by a state court's construction of its own penal statutes." *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993).  *See also Oxborrow v. Eikenberry*, 877 F.2d 1395,

1399 (9th Cir. 1989) (a federal court sitting in habeas corpus must defer to the state court's construction of its own penal code unless its interpretation is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation"). Accordingly, to the extent that Petitioner's claim is premised upon the trial court's failure to give a lesser included offense instruction, this claim is not cognizable on federal habeas corpus review.

Petitioner could still be entitled to habeas corpus relief, however, if he could establish that the state court violated his due process rights by omitting the proposed jury instruction if the alleged error so infected the entire trial that the resulting conviction violated due process. *Henderson*, 431 U.S. at 155; *Menendez*, 422 F.3d at 1029. In order to prevail on due process grounds, however, a petitioner must demonstrate that the alleged instructional error had a "substantial and injurious effect in determining the jury's verdict." *Brecht*, 507 U.S. at 623. In other words, Petitioner must prove that, had the requested instruction been given, there is a "reasonable probability" that the jury would have reached a different verdict. *Clark v. Brown*, 450 F.3d 898, 916 (9th Cir. 2006). In the context of an allegation that the trial court failed to give a jury instruction, the burden is "especially heavy" because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of law." *Henderson*, 431 U.S. at 155.

Petitioner has failed to meet the demanding standard for habeas corpus relief based on his claim that the trial court failed to give a lesser included offense instruction. The trial court's refusal to give a lesser included offense instruction on involuntary manslaughter did not render Petitioner's trial fundamentally unfair in violation of due process. As properly explained by the state appellate court, the evidence presented at trial could not be construed to support a verdict of involuntary manslaughter. Thus, there is no reasonable probability that, had the jury been instructed as Petitioner wished, the outcome of his trial would have been different. Petitioner is not entitled to federal habeas corpus relief on this claim.

/////

## 2. PINPOINT SELF-DEFENSE INSTRUCTIONS

Petitioner claims that the trial court's refusal to give pinpoint instructions on his right to self-defense violated his federal constitutional right to trial by jury, to convey his theory of defense, and to due process.

The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on direct appeal, explaining as follows:

> Defendant contends the trial court erred in refusing his pinpoint instruction on self-defense. As modified, that instruction read:

> "Evidence has been received that the defendant may have gone upon the property of SD/CH for the purpose of purchasing marijuana from someone on the property and did not intend to commit robbery or burglary. If you cannot find beyond a reasonable doubt that the defendant entered the property with the specific intent to commit either the crimes of burglary, or attempt to commit burglary, or robbery, then the use of deadly force or force likely to result in serious bodily injury by the persons killed to (1) protect their marijuana garden from theft or (2) obtain revenge for the shooting of a dog by the defendant, would not be justified under the law. In response to the threat of, or use of any deadly force or force likely to result in serious bodily injury by the persons killed for the mere purpose of protecting their marijuana garden from theft or to retaliate against the defendant for the shooting of a dog, the defendant would be justified in resisting any such deadly force if he acted under the applicable rules of self-defense I have given you previously. Under these circumstances, any killing by the defendant would be justified and not unlawful."

> Defendant contends this instruction was warranted by his testimony that "somebody stuck a gun in his face, to obtain revenge, after he shot the dog." The People counter that, because the proposed instruction assumed the victims used deadly force, it was impermissibly argumentative. They further argue the instruction was misleading, because it assumes the victims' right to use deadly force depended on whether defendant entered the property to commit robbery or burglary. Finally, the People argue any error in failing to give the instruction was harmless under the circumstances. The People have the better argument.

> "A trial court must instruct on the *law* applicable to the facts of the case. [Citation.] In addition, a defendant has a right to an instruction that pinpoints the *theory* of the defense." (*People v. Mincey* (1992) 2 Cal.4th 408, 437.) "In a proper instruction, '[what] is pinpointed

-16-

is not specific evidence as such, but the *theory* of the defendant's case.'" (*People v. Wright* (1988) 45 Cal.3d 1126, 1137.)   Thus, a court must "refuse an argumentative instruction, that is, an instruction 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.'" (*People v. Mincey, supra,* 2 Cal.4th at p. 437.)

The trial court rejected defendant's proposed instruction.  Instead, the court gave the following general instruction: "One may use deadly force, or force likely to produce great bodily injury in defense of their habitation, person or another person.  One may not use such force to protect property."

As with the trial court's decision not to give an involuntary manslaughter instruction, the record does not contain any explanation for the court's rejection of defendant's pinpoint instruction.  However, we discern a number of reasons the instruction should not have been given.

First, the instruction begins by highlighting defendant's testimony that he entered the property for the purpose of buying marijuana, a matter more properly reserved for argument.  A court may properly instruct that if the jury finds defendant entered the property with the intent to buy marijuana, certain legal principles apply.  However, it is not proper to remind the jury that certain evidence was presented to support such a finding.  This is for the parties to argue.

The next sentence of the instruction states that if the jury cannot find beyond a reasonable doubt defendant entered the property to commit a robbery or burglary, then the victims were not permitted to use deadly force to protect their marijuana or revenge the shooting of the dog.  As the People correctly point out, this sentence improperly assumes the victims used or threatened to use deadly force against defendant, a matter in issue.  In any event, this point was more accurately addressed in the instruction the court gave than defendant's proposed instruction.  It was a matter of argument for defendant to inform the jury that "property" within the meaning of the court's instruction includes the marijuana and the dog.

The last two sentences of the instruction likewise assume the victims used deadly force in the defense of their property.  The proposed instruction states that under those circumstances the defendant would be justified in resisting such force.  This point is covered in CALJIC No. 530, where the jury was instructed: "It is lawful for a person who is being assaulted to defend himself from attack if, as a reasonable person, he has grounds for believing and does believe that bodily injury is about to be inflicted upon him.  In doing so, that person may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person in the same or similar

-17-

circumstances to be necessary to prevent injury which appears to be imminent."

In sum, defendant's proposed instruction improperly highlighted defense evidence and assumed facts in issue.  As for the general principles articulated in the instruction that were not argumentative, they were adequately covered in other instructions.  "A trial court is not required to give pinpoint instructions that merely duplicate other instructions."  (*People v. Panah* (2005) 35 Cal.4th 395, 486.)

*Huggins*, 2009 WL 774512 at *9-*10.

Petitioner has failed to demonstrate that the trial court's failure to give the above described instruction violated his federal constitutional rights.  As explained by the state appellate court, the trial court's rejection of the instruction was correct under California law.  *See Oxborrow v. Eikenberry*, 877 F.2d at 1399.  Moreover, even if the trial court erred as a matter of state law in its ruling, "a mere error of state law . . . is not a denial of due process."  *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) (internal quotations omitted).  Thus, in order to obtain federal habeas corpus relief, Petitioner must show that the trial court's failure to give the requested pinpoint instruction, considered in the context of the instructions given and trial record as a whole "so infected the entire trial that the resulting conviction violates due process."  *Estelle*, 502 U.S. at 71-72.

Once again, Petitioner fails to meet the demanding standard for obtaining federal habeas corpus relief based on an alleged instructional error.  The trial court's rejection of his proposed pinpoint instruction did not render his trial fundamentally unfair in violation of due process.  Although "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule" that an alleged instructional error is not cognizable for federal habeas corpus relief, Petitioner's was not such a case.  *Solis v. Garcia*, 219 F.3d 922 (9th Cir. 2000).  *See also Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (state court's jury instructions violate due process if they deny the criminal defendant "a meaningful opportunity to present a complete defense").  As noted by the state appellate court, the proposed instruction contained improper argument and assumed facts in issue at trial.  Moreover, the concept

-18-

of self-defense was already covered by the standard instructions issued by the trial court.  *See generally Duckett v. Godinez*, 67 F.3d 734, 743-46 (9th Cir. 1995) (holding that due process does not require the trial court to instruct on the defendant's precise theory of the case where other instructions adequately cover the defense theory).  Petitioner is not entitled to federal habeas corpus relief on this claim.

**B. PHOTOGRAPHIC EVIDENCE**

Petitioner claims that the trial court violated his federal constitutional right to due process of law by excluding from evidence photographs of multiple weapons found at the crime scene which supported his theory of self-defense by demonstrating the victims' propensity for violence and contradicted the prosecution's theory that the crime scene was not an unlawful marijuana growing enterprise involving weapons.

The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on direct appeal, explaining as follows:

> Defendant contends the trial court erred in excluding proffered photographs of weapons and ammunition purportedly found on the property where the shootings occurred.  Defendant argues this evidence was necessary to support his claim that the victims were there to guard the marijuana and he entered the property "with the state of mind of needing to defend himself."  According to defendant, "although counsel was permitted to present general reputation evidence about the victims' reputation for violence, the court excluded the photographs of numerous weapons found in the marijuana garden and the living quarters."  Defendant argues such evidence, which revealed "a veritable arsenal of rifles, scopes, and ammunition," "was necessary to bring home to the jury the truth of the reputation evidence and bolster [defendant]'s proffered defense of self-defense."
>
> Defendant requested permission to present the photographs to the jury during opening statements.  Defendant argued there was a "realistic likelihood" the photographs would be admitted into evidence and the photographs were "crucial" to his theory of self defense.  The trial court disallowed use of the photographs without explanation.  Later, after all evidence was in, defendant put on the record he had made an offer of proof that he would have examined one of the police officers to establish the existence and location of the

-19-

firearms and ammunition depicted in the photographs for the purpose of supporting his claim the home was being used for drug dealing. The court noted defendant's objection for the record but gave no further explanation for its ruling.

The trial court did not limit defendant's ability to present evidence about the victims' propensity for violence or that they were involved in drug dealing. Evidence was presented that, inside the trailer, officers found a suede handgun carrier with a 9 millimeter Taurus handgun inside. Amy Butler testified she told defendant the victims were good fighters and there were firearms in the trailer. There was also evidence presented that the victims sold marijuana and a police officer testified that people in the business of selling marijuana protect their product with guns. A friend of the victims testified he knew the victims used guns to guard the marijuana, there were guns inside the trailer, and Scott Davis was a tough guy who was not one to back down from trouble. Defendant's sister told one of the officers the victims were known for getting into fights and on one occasion used a gun while confronting someone who tried to steal drugs in the neighborhood. Another officer testified that she found a shotgun and an empty handgun holster in one of the bedrooms of the house. There was also evidence that officers found a pellet gun in a tent on the property. Finally, defendant testified that Butler told him the victims carried guns at all times and were "big mother fuckers."

"The issue of the relevance of evidence is left to the sound discretion of the trial court, and the exercise of that discretion will not be reversed absent a showing of abuse. [Citations.] That discretion is only abused where there is a clear showing the trial court exceeded the bounds of reason, all of the circumstances being considered." (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 32.)

Under defendant's theory of the case, he believed the victims were dangerous and would be armed. Therefore, he armed himself when he went onto the property. There was plenty of evidence presented to the jury in this regard. However, this circumstance has no bearing on the crucial issue in the case, i.e., whether defendant went onto the property for the purpose of purchasing marijuana or of taking it by force. Because defendant's fear would have existed regardless of his intent, the legitimacy of that fear would not have provided any support for his theory. Furthermore, defendant did not testify he was met with a barrage of firepower when he entered the property. He testified one of the victims put a gun in his face and he and the victim struggled over that gun, while the other victim jumped defendant without a gun. Therefore, whether there were other weapons on the property would not have made defendant's description of the events any more believable.

At any rate, "[a] verdict or finding shall not be set aside, nor shall the

-20-

judgment or decision based thereon be reversed, by reason of erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice . . . ." (Evid. Code, § 354.)  A miscarriage of justice should be found only where it is reasonably probable a result more favorable to the appealing party would have been reached in the absence of error.  (*O'Hearn v. Hillcrest Gym & Fitness Center, Inc.* (2004) 115 Cal.App.4th 491, 500.)

In light of the evidence presented regarding the victims' propensity for violence, the weapons found on the premises, and defendant's description of how the victims were killed, it is not reasonably probable the outcome of the case would have been any more favorable to defendant if the proffered photographic evidence had been presented to the jury.

*Huggins*, 2009 WL 774512 at *10-*12.

To the extent that Petitioner contends that the trial court improperly excluded that the trial court improperly excluded the photographic evidence under California state evidentiary law, his claim fails because habeas corpus relief will not lie to correct errors in the interpretation or application of state law.  *Estelle*, 502 U.S. at 67.  "State court rulings on the admissibility of evidence generally fall outside the scop of federal habeas [corpus] relief, which is designed only to remedy violations of federal law."  *Winzer v. Hall*, 494 F.3d 1192, 1198 (9th Cir. 2007).

Criminal defendants, however, have a constitutional right to present a defense.  *Washington v. Texas*, 388 U.S. 14, 19 (1967).  *See also Crane v. Kentucky*, 476 U.S. 683, 687 (1986); *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Webb v. Texas*, 409 U.S. 95, 98 (1972); *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009).  However, the constitutional right to present a defense is not absolute.  *Alcala v. Woodford*, 334 F.3d 862, 867 (9th Cir. 2003).  "Even relevant and reliable evidence can be excluded when the state interest is strong."  *Perry v. Rushen*, 713 F.2d 1447, 1450 (9th Cir. 1983).  A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas corpus relief only where it renders the state proceedings so fundamentally unfair as to violate due process.  *Drayden v. White*, 232 F.3d 704, 710 (9th Cir. 2000); *Spivey v. Rocha*, 194

F.3d 971, 977-78 (9th Cir. 1999); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).

Generally, it takes "unusually compelling circumstances . . . to outweigh the strong state interest in administration of its trials." *Perry*, 713 F.2d at 1452.  The United States Supreme Court has expressed its

> traditional reluctance to imposed constitutional constraints on ordinary evidentiary rulings by state trial courts.  In any given criminal case the trial judge is called upon to make dozens, sometimes hundreds of decisions concerning the admissibility of evidence . . . . [T]he Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive . . . only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.

*Crane*, 476 U.S. at 689-90 (internal quotations omitted).  Five factors are considered when determining whether a petitioner's due process rights were violated as a result of evidence excluded at trial: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *See Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004).  Even if the exclusion of evidence amounts to constitutional error, in order to be entitled to federal habeas corpus relief, Petitioner must still demonstrate that the exclusion rendered his trial fundamentally unfair in that it had a "substantial and injurious effect on the jury's verdict. *Brecht*, 507 U.S. at 623.  Thus,  "[a] habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005).

Petitioner has failed to demonstrate that the trial court's ruling excluding the photographic evidence rendered his trial fundamentally unfair.  Even if Petitioner's allegation that the trial court improperly excluded the evidence might otherwise have merit, nevertheless, for all of the reasons cited by the state appellate court, there is no reasonable probability that the alleged error had a substantial and injurious effect on the jury's verdict.  As the state court properly

explained, the photographic evidence was cumulative of other evidence and testimony presented at trial. Thus, the jury was aware that the victims owned multiple guns, possessed ammunition, and had a propensity for violence and to fight. The jury was also presented with evidence that the victims sold marijuana, that they were known to use guns, and that Petitioner was aware that they were armed. Moreover, the state court explained that the photographic evidence was irrelevant because it had no bearing on the issue of whether Petitioner entered the victims' property for the purpose of either purchasing marijuana or taking it from the victims by force. The state appellate court's rejection of this claim is not contrary to or an unreasonable application of federal law, and Petitioner is not entitled to federal habeas corpus relief.

## VI. CONCLUSION

For all of the foregoing reasons, the petition should be denied. Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY RECOMMENDED that:

1.      Petitioner's July 1, 2010 petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 be denied; and

2.      The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections

-23-

within the specified time waives the right to appeal the District Court's order.  Martinez v. Ylst, 951

F.2d 1153 (9th Cir. 1991).  Any reply to the objections shall be filed and served within seven days

after service of the objections.

DATED: January 18, 2012

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE